Small, small sound check before we get rolling. Okay. Thank you. Hi Judge Vinasky, this is Bill Bradley. Can we ask you to do a sound check? If you could just do testing 1, 2, 3, up to 8, please. Testing 1, 2, 3, 4, 5, 6, 7, 8. Testing again. Is that fine? Well Judge, that completes our sound check for today. And we will have the other judges out very shortly. Thank you for your patience. Okay. Please rise. We're in sound session, please be seated. Good afternoon. Excuse this unorthodox way of proceeding. We thought we could have a video hookup, which I guess has not really worked. But Judge Vinasky, are you there? I am here, Judge, right now. All right. We want to thank Judge Tom Vinasky from the Middle District, District Court, for the Middle District of Pennsylvania for sitting with us. And because we had the one argue case, we figured we could do this without making Judge Vinasky come all the way across the state. But we thank you, Tom, for helping us with our cases. And we couldn't do the work we do without the help of District Court judges. And we thank you for volunteering. Well, I didn't want to say anything about that. These things happen, though. It's fine. And we will probably ask the lawyers to go a little bit slowly, and maybe a few pauses here and there, because since Judge Vinasky is on speaker, we probably can't be talking at the same time. All right. Let's proceed. In re Pittsburgh Corning Corporation, counsel for appellants, Mr. McClain. Thank you, Your Honor. Thank you, Your Honors. May it please the Court, my name is David McClain, appearing for the appellants. I'm counsel for Mount McKinley Insurance Company and Everest Reinsurance Company. I will be doing all of the argument. However, with me today is Russell Roten of the Duane Morris Law Firm, who represents the other parties who are appellants. But I will be doing the argument, Your Honor. Judge Vinasky, can you hear all right? I can hear fine. Thank you. Okay. And, Your Honors, I'd like to reserve three minutes for rebuttal, if acceptable. Your Honors, the issue in this case is whether the district court erred in failing to reach the issues of whether a rule designed to protect the integrity of the bankruptcy process should be strictly enforced, and secondly, whether the district court erred in determining that the appellants lack standing and that the matter is not right. The facts of this case are not hotly contested, disputed, and with the Court's permission I will only very briefly address those facts. All right, if you wish. We have reviewed the case in the brief, so use your time as you see fit. Thank you, Your Honor. The most significant thing that I think the Court should be aware of, cognizant of as we go forward, is what the order below in the bankruptcy court actually did do. Bankruptcy Rule 2019 provides for certain mandatory disclosures by entities, including law firms that represent multiple parties and interests in a case. That rule was modified by an order entered by Judge Fitzgerald, the bankruptcy court, which was the trial court. That modified order allowed the filing of exemplars of representation agreements, in this case most likely attorney-client retention agreements. The 2019 order, as it's called, also allowed for the filing to be made in a non-public way. In other words, despite the fact that Rule 2019 mandates the filing of record, the 2019 order in this case allowed the filings to be made but not be accessible to the public absent the filing of a new separate motion by the party, asserting and presumably having the burden to show that they have a legitimate interest in seeing the information that was contained in the truncated 2019s that were filed. Now, what happened here was that the Court allowed the filing of one document, and the lawyers could say, I have these clients who have entered into this agreement. That is correct, Your Honor. So how is that different from having the 60 pages of exemplar or actual documents as compared to the exemplar? What's the difference? The difference, Your Honor, is that it's probably not 60 pages. It's probably thousands of pages, as Mr. Estiman, I'm sure, will tell you. Well, what's the substantive difference? The substantive difference, Your Honor, is that if the actual documents are filed, then the representational capacity can be tested. Whereas what we have here is a situation in which an exemplar is filed, and that's it. Why do you think – what evidence is there here that there is any need to test the representational capacity? Your Honor, unfortunately, there's – I have two answers to that. One is I can't point you to specific evidence because that evidence is what I would have had if the 2019 order had not been entered, first and foremost. Secondly, unfortunately, in this field, in the area of mass tort bankruptcies in particular, there is extensive evidence of systemic fraud in the filing of these claims. Well, there are in other cases, and there are factual findings been made by other bankruptcy judges about it in a specific case. That's correct. What do we have in this case that would say that there's any problem with what's been filed? The record in this case, Your Honor, includes references to a number of secondary authorities that don't relate specifically to this case because we didn't get discovery in this case, and we didn't get the 2019s that would allow us to answer, Your Honor, the way I think you want to be answered. Well, what did you do to try to seek that evidence? I mean, you filed a motion to determine standing or to intervene. You filed a motion to order a noncompliant law firm's right to be heard. I mean, you filed some motions. Did you try to get discovery here? Your Honor, discovery efforts were, I mean, I guess what I would say in response to that, Your Honor, is discovery efforts were unavailing. There were efforts at obtaining discovery. This appeal is not an appeal of those discovery efforts. This is an appeal of the 2019 order that was entered, and we as a party, like all parties, are entitled to rely upon a rule that the Supreme Court has promulgated that says that the public is entitled to certain information. Well, this then gets into the issue of standing. Yes, Your Honor. Because no one can come in and say, oh, someone didn't comply with a rule, and there's a problem, so do something. It seems like it's very circular reasoning here, but how are you aggrieved by this order? Well, Your Honor, this court has issued recently a couple of important opinions dealing with standing and particularly dealing with mass tort asbestos cases. And in the Congolian case, which is the most recent of those, this court found that a person-agreed standard is jurisprudential and not a strict statutory requirement for standing. In other words, in the combustion engineering case, which predated it and was factually very distinguishable and procedurally very distinguishable, the person-agreed standard was applied. But in Congolian, because it was a case in which a challenge was made that the integrity of the bankruptcy system was at stake, was at issue, this court held that the person-agreed standard is merely jurisprudential and not strictly statutory. In this particular case, it is a case much like Congolian. At issue in Congolian, as Your Honors are undoubtedly aware, was the retention of special insurance counsel. But the issue that the court heard that made it determine that standing was appropriate was that it was a situation in which the retention would, as the court wrote, the retention of special insurance counsel is an important preliminary matter that will profoundly affect the determination of the validity of a proposed plan ab initio. The court continued, it is an issue based on procedural due process concerns that implicate the integrity of the bankruptcy court proceeding as a whole. And, Your Honor, that's the case here as well. Well, we already have plan voting, do we not? Your Honor, plan has been voted on, yes. Ninety-nine percent approval. Ballots were cast by law firms. There's no assurance in the record that any plaintiff who has a claim in this case received a disclosure statement, received a ballot, received a copy of the plan. There's no assurances that they know who voted their claim. But you're right, Your Honor. Ninety percent of the ballots, in excess of 99 percent of the ballots that came in, were voting in favor of the plan. Now, we said in Congolian preliminary, exclusive of preliminary matters, that you were outside the drift. You waited four years on this one. How can you classify that as a voting preliminary? Your Honor, I would disagree with the appellee's characterization that we waited too long or that it was, in fact, a four-year wait. And before going into the details of that, let me just pose to you this. If we had, in fact, done as the appellees suggest we should have, if we had filed on day one of this case a motion to enforce Rule 2019 as required, the responses would have been as follows. Number one, it's a self-effectuating rule. No motion is required. And number two, because no plan is on file, there's no way that you can indicate in any way that your rights are affected or that your person agreed. So the deadline that one looks at to determine when action should be expected is not the filing of the petition, as the appellees suggest to you, but rather when was there something in the case that meaningfully could affect the rights of your appellant. And that was substantially later. In this case, the plan was filed on October of 2003. The motion to invalidate the ballots was filed within months. It was filed in March of 2004. And the 2019 order was issued in August of 2004. Your motion was filed after the vote was certified, right, or the date it was certified? Your Honor, the motion was filed at the date that it was certified, is my recollection of what the record reveals. But the question here, and the reason for that, Your Honor, is that the issue became, what do we do about these ballots when it became, I mean. Well, didn't the Bankruptcy Court, didn't Judge Fitzgerald rule that you don't have staff standing to challenge the ballots? She ruled, Your Honor, that the London Market. At May 11, 2004. Yes, Your Honor. She ruled that the London Market insurers, who were the parties that had filed that motion, lacked standing. Now, it was the London Market insurer's position that that is a substantive ruling. Was it absolutely necessary to come to this court and seek an interlocutory appeal, or was it better to argue those in final confirmation if confirmation was, in fact, approved? Unlike the instant case, which really is a procedural case, which goes to the fairness, if you will, of the system. Whether or not we are being provided with the information that the Supreme Court of the United States has said we are entitled to. Would that mean that anyone in the world would have standing to challenge what happened here? I don't know about anyone in the world, Your Honor, but I would suggest that anyone who is in the position of your appellants, who is being asked to pay the bill if this plan is confirmed, certainly has standing. But is there any evidence that this plan is anything other than neutral vis-a-vis? Yes, Your Honor. That, to me, was important, and I saw that referred to in some of the cases, and yet I didn't really see that in the appendix or really argued. But it seems to me the court made a finding. The court made a specific finding that all rights are reserved under these policies and the plan is neutral, and I think that was in the order approving the disclosure statement. So if you had a problem with that. Your Honor, the problem with that, Your Honor, is that that ruling isn't really a ruling, and the reason is that's the court anticipating what she will do when she's presented with a plan. Well, tell me how it's not neutral. There's a number of ways, Your Honor. The plan itself, which I would agree is not before Your Honors, but it is relevant to standing. The plan is funded through an assignment of our insurance policies, my client's insurance policies. We pay for the claims that are allowed under the trust distribution procedures that would be enacted if the plan were, in fact, to be approved. The plan and the trust distribution procedures strip us of our contractual rights to investigate and to withhold payment of claims. It's a contractual right, bargain for, and we have it. The plan requests findings with respect to fairness of the plan itself and of the trust distribution procedures. The significance of that is that rather than an insurer evaluating claims that are brought against it and determining whether to settle those claims, deem them meritorious, litigate them, or what have you, instead of that, all of that decision-making is being substituted by a trust, a trust that in this case, like many of the cases, will be controlled by the plaintiffs who are the beneficiaries of the trust. So you have a situation in which the payee is going to be controlling the payment, and we are the payor. Have you cited provisions of the plan that take away your rights? Your Honor, in our briefing, we mentioned the things that I just mentioned to you, and I notice my time is up. I'll continue answering your question with the Court's indulgence. Let's give another four minutes. We have, Your Honor, in our briefing, and particularly in our reply brief, talked about the fact that the assignment is assigning our contract. We have talked about the... Well, but I mean how it affects your rights, because if you're an insurance company today and you have to pay certain claims, and if there's a plan and that affects the way in which your contract is with respect to those claims, that's one thing. Then maybe you're aggrieved by virtue of the plan or by virtue of not being able to get behind the plan, assuming there was evidence that there was a reason to get behind it. But I don't have anything before me that says this is how you are being harmed by what's going on here.  One, more claims will be paid, more money than would be paid otherwise. And secondly, there is evidence, and I grant you it is secondary authority, but there is evidence in the appendix, in the supplemental appendix, that demonstrates that there are numerous claims that are simply without value that would be paid if this plan is approved. There is a study included by Professor Gitlin. Was that in the supplemental appendix? Yes, Your Honor. Was that before the District Court or the Bankruptcy Court? The supplemental appendix was not, Your Honor. We review records that are before courts. We do not take judicial notice or take in extraneous records. Your Honor, I apologize. My understanding is that this record includes that supplemental appendix by order of the court, but I may be mistaken. We do not. I don't think we've ordered that. Mr. McClain, if you were to obtain relief here, I'm trying to see how you would be benefited if the Bankruptcy Court has found that you don't have standing to challenge the ballots, what would give you the authority to contest representational capacity? Well, I believe that the finding that we don't have standing to challenge the ballots was an error, Your Honor. That's not in front of you today, but it is our position that was an error. You didn't file an appeal from that court? No. No appeal reached this court, Your Honor, because that is probably an interlocutory appeal. It is, as I described earlier, a substantive appeal that is preserved until a plan is finally approved. But how can we simply… It has not been approved yet. That's correct, Your Honor. If I may, I understand Judge Nygut has a question. How can we then just simply ignore that order of the court which denied you standing, which wasn't appealed? Now you're leapfrogging over that, saying we do have standing. Because it's a totally different issue, Your Honor. The issue here is something that is given as a matter of right by the Supreme Court when it enacted the Federal Rules of Bankruptcy Procedure. And it enacted it for a very good reason, so that nobody would have to go petition a court, nobody would have to second-guess or wonder about the integrity of the bankruptcy process. The reason that it did that, Your Honor, goes back to rules that were enacted and code sections that were enacted in the 1930s because there was block voting. There were people who controlled large numbers of claims and voted them. And there was a significant question in an SEC study that was created by Justice Douglas and is included in many of the cases that are cited in the record. There was a real concern by the SEC, by Congress, ultimately by the Supreme Court, that these block voting of people who were, as described by what became Justice Douglas, small players, threatened the integrity of the process because it was not their interests, ultimately, that were being voted. Query what would happen here if, in fact, the 2019 statements had been filed as they should have been and it was incumbent upon somebody to demonstrate that actual authority. Then there would be certainty, there would certainly be more certainty, that the party who has that economic stake has an informed consent, that they may not get a disclosure statement, they may not get a ballot, they may not get a copy of the plan, but there would be some assurances on the part of the judge and some assurances on the part of the other parties in the bankruptcy that the system was fair and not manipulated for the benefit of a few. They have filed such statements here. They have complied, or I've looked at and seen statements filed. Now, it is only an exemplar. Maybe that's the issue you have. But you have lawyers swearing in an affidavit that these are the clients they represent. Your Honor, I see that I am again out of time. The answer to that particular question is that compliance with Rule 2019 did not occur in this case. Partial compliance with 2019 did occur. There were several things that were omitted, and most importantly, although not only, the filing of the exemplars is not allowed in, and it hasn't been allowed in any of the predecessors of Rule 2019 since the 1930s. It was strongly urged in the 1930s when the original idea of ensuring adequate representation was being debated, that the actual copy was necessary. Those, Your Honor, were not filed. And as a consequence, there's no way to test whether or not there is actual authority. And as I'm sure the appellees will concede to you, there are many cases, and as is obvious from reading Congolian and from reading combustion engineering, there are many cases, and in fact it's a practice for lawyers to refer matters to other lawyers. The concern here, Your Honor, is that a person may not have a clue whether or not they voted in favor of this plan. They may never have seen a plan, a disclosure statement, or a ballot. They may have no idea what the treatment of this plan will be for them, and they may not even know what lawyer filed it for them. And I guess a rhetorical question, although I'd hate to offer up rhetorical questions, but let me ask this because I think the answer is telling. Why is this so hard fought? Why are we in front of the Third Circuit, the second highest court in the land, trying to get something that The answer is because you took an appeal. Your Honor, that's a fair answer. The question I'm asking is why is it that somebody fought with us so hard to avoid getting something that the Supreme Court has adamantly said should be filed of record? And secondly, Your Honor, why is it that they fought so hard for those things to be not available even when they're filed as exemplars? It's important to remember, and I'll refer back to Judge VanAskey's question, it's important to remember that even what was filed is not available to us. We don't have it. Now, we have not filed, Your Honor is correct, we have not filed a motion, and the reason we didn't file a motion is that to file a motion would be to skip the underlying question. The real question here is was the order's provisions that said that we must, that they need not file in strict compliance with 2019 correct? That is a threshold issue, and whether we filed a motion or not, that threshold issue still arises. Assume for the sake of argument that we had filed a motion. We know with certainty, because they said it in their briefs, that the certain law firm, would vigorously oppose us receiving relief pursuant to that motion. We know as a matter of certainty, and it's cited in our reply brief, that in situations in front of Judge Fitzgerald where this issue has been addressed, where a motion actually was filed, we know with certainty that the motion was denied. So the question here, Your Honors, is there's a rule that requires strict construction, strict appliance of a disclosure obligation. This court in Combustion Engineering and in Congolian pointed out how important it is, particularly in the world of bankruptcy, that the system appear fair, that it appear reasonable. This is one part, this rule is one part of an overarching scheme designed to ensure that fairness and that transparency. Thank you, Your Honor. Judge Van Aske, are you all right? We'll hear from counsel on rebuttal. I'm all right. Thank you. No other questions. Thank you, Your Honor. My name is Sandy Esserman. I'm up here on behalf of certain of the employees, that being the Baron and Budd firm and the Silver Perlman firm. The debtor's attorney, David Ziegler, will handle the case for the debtor. To a certain extent, the argument got ahead of itself, and that's okay. But I think first we need to decide whether or not the insurers have standing here. Standing is something that this court has issued several rulings on. I don't think that there's anything inconsistent. In fact, I think it would be consistent to hold that the insurers do not have standing here. They're not an aggrieved party in any way. They do not meet the requirements as set forth in our brief of standing. And I think you have to look at all this in the factual context. And Your Honors are generally familiar with the facts. But this case was filed on April 16, 2000. The 2019 issues were coming up and being raised by the insurers in 2004. My clients, both of my clients, shortly after the case was filed, filed 2019 statements. They filed 2019 statements on the record. And the 2019 statement that Judge Fitzgerald entered in all of her cases was not exactly pinpoint of the 2019 statement in the code. What Judge Fitzgerald did was, what I believe she did, was balance 2019 as against what should happen in a mass tort case, giving the information that she felt was important in a 2019. Now, Judge Fitzgerald first addressed this issue in August of 2004, having, well, first it issued its first ruled 2019 order. Was that in response to the appellant's motion? Or was that just out of the blue? I think it's because the issue had been raised by appellants. I don't think it was in response to the appellant's motion. Because the issue had been raised quite a while before. And then all of a sudden, in August of 2004, she issues the first ruled 2019 order, then has a hearing, orders full compliance, then issues an amended order, then in October issues a final order. Well, there was a complaint that my clients, for instance, had not complied with ruled 2019 the way they view it. Now, we had filed it three and a half years earlier. And after the voting was done, after the ballots had been filed, after they had been denied their motions that your honors are familiar with and mentioned, Judge Fitzgerald said, you know what, just to alleviate any confusion on the 2019, I'm going to issue a 2019 order in all my cases. And that's what she did. She issued identical orders, identical 2019s in every one of her cases. Several of them were appealed. This was the only one to make it to the circuit court level. One was in Kaiser, and that has been the court there ruled no insured standing, I believe no rightness. And if in fact, it was Judge Farnan, if in fact they did find that there was standing or the appellate court found there was standing, the order was reasonable and balanced the interests of the parties. And furthermore, the insurers never asked for it. Insurers never did a one paragraph, I want this information because, period, which is all it would take. And there would be a hearing on that. Instead, what we've got is an appeal before this court, and Your Honor heard a lot of what I consider the collateral issues on this case. Not on this case, on the Pittsburgh coin bankruptcy itself. Is the plan insurance neutral? Well, Judge Fitzgerald has so many statements on the record that this is insurance neutral. She is literally blue in the face from saying it so many times. But the insurers want assurance after assurance after insurance. In fact, it is insurance neutral. And the insurers are not parties in the sense of creditors. They are not creditors. They did not file 2019s. They have lawyers representing. But if they're funders of the plan, they have an interest, don't they? They have an interest if in fact they are going to fund the plan, in which the insurance neutrality preserves their right to contest those claims that may be approved by a TDP. And that's the key of insurance neutrality, Your Honor. You challenge the appellant's statements that they will lose the right to investigate and the right to determine on their own, and they are sacrificing certain rights? Absolutely. You know, they have their rights that they may have to challenge the payment of claims. They can say you shouldn't have paid that claim or that claim should not be approved. That's what insurance neutrality is all about. It's about preserving the insurer's right for a state court, another court, to determine whether or not the insurer should pay. If you listen to the appellant, it's the court is going to approve a TDP, the TDP is going to approve claims, and the insurer then has to pay. Nothing could be further from the truth. The trust distribution procedures will be approved, assuming that they're fair and vetted by the court and approved by the court. They will be implemented by third-party trustees. And, in fact, if there is insurance, the insurers may well be presented with a bill at which time the insurers can say we don't owe a dime because. Now, confirmation has not occurred, correct? Incorrect. Confirmation has occurred. However, confirmation of the current plan to which all this excitement has led us today is, in fact, confirmation of that plan was denied as being inconsistent with, I believe, the combustion engineering opinion. And it has been, there's been, I believe, and the debtor can speak to this in a little bit, but there's a motion for reconsideration of certain issues on the plan. Isn't there a basis at the time that the plan is confirmed for the appellants to file an appeal to that as agreed parties if the plan has been anything but insurance neutral? If they have standing, of course. And if the plan is not insurance neutral, then there is an argument that they have standing, and at that point the decision is right for them to appeal. But certainly not until then. And certainly to talk about a 2019 order, which is purely procedural and has been complied with, and to complain about exemplars. And just so Your Honor understands, what the plaintiffs did in this case was file a paper saying, under oath, penalty of perjury, that in fact every client, every one of their clients, has signed a particular form of contract. And 2019 goes to the representation provision. That is, what 2019 is concerned about is, am I, Sandra L. Esterman, authorized to stand here on behalf of those clients, and therefore it is crafted to look at the representation provision. What was filed was not the representation provision, not the I, Joe Q. person, authorize you, lawyer, Sandra Esterman, to appear before me. The whole fee contract was filed. That is, with the percentages, other areas that have nothing, and Judge Fitzgerald wanted that filed, the firms complied. So, and every fee contract is not identical. Your Honor has practiced law. Every client does not have the same fee contracted. Notwithstanding that, any time a different fee contract was entered into by one of the plaintiffs, that fee contract is also attached. So clients 1 through 10 signed exemplar A, 50 through 100 may have signed B, and all these were put in file. So we think it's a complete red herring. We think that the information has been put on record. Judge Fitzgerald did a nice job of trying to balance the issues in her court of having a 2019 statement filed. 2019, frankly, is an area of law that is procedural. It doesn't come up very often. There's not a lot written about it in the courts because it's really, it should be fairly uncontroversial. But you can see there are situations where someone in their position could be aggrieved. An insurer?  Of course, if, in fact, the plan was not insurance neutral. If, in fact, they're a creditor of the estate, and that, in fact, happens. Sometimes insurers become creditors, not in this case. In this case, you have the situation not only are the insurers not creditors, but they owe the debtor money, and they haven't paid. They're defendants in lawsuits, in state court lawsuits, to pay. At least some of the insurers are. So this is sort of turning everything on its head. I don't see how, on this narrow issue of 2019, how, in fact, the insurers have been harmed here. I see I'm out of time. All right. We'll hear now from Ziegler. By the way, before we go into setting the clock again, there's three outstanding motions, I believe. One of them has to do with the Supplemental Appendix, and I don't believe an order was entered there. Another has to do with converting one party into an appellee and allocating time, which I assume is moot at this point. And another has to do with the Zarkanian opinion. Am I correct that those are three outstanding? Your Honor, that's my understanding. Is the second one moot at this point? Your Honor, it's moot to the extent, if I can take one very brief moment. It's moot with respect to the oral argument aspect, absolutely. The London market insurers are satisfied. Mr. Roten will represent that to the Court to allow us to take the argument. The question was whether or not, what the proper procedural stature was. With respect to argument, it's moot. Okay. All right. Your Honor, excuse me. David Ziegler on behalf of, I represent Pittsburgh Corning Corporation. I'm speaking today on behalf of Pittsburgh Corning Corporation and our co-plan proponent, the Asbestos Creditors Committee. Could you speak up a little or raise the mic? I'm speaking today on behalf of Pittsburgh Corning Corporation and the other plan proponent, the Asbestos Creditors Committee. Your Honor, I think from what I've heard so far between what counsel has presented and, again, questions from the Court, the Court is well aware of the issues here. I just have a few points to kind of touch on briefly. It seems like there's been a little bit of confusion as to the status of the motions below. The appellants had represented in their briefs that this was actually, they're appealing from an order denying the motion, one of the motions in the Court below. And, in fact, that's not the case. This is an appeal from the 2019 order. I'm still struggling to hear you. I'm sorry, Your Honor. I've had a bit of a sore throat. It's hard to speak up too much. The London Market filed, the first motion below was a motion to determine standing or to intervene, and the Bankruptcy Court denied that motion. Later, the London Market filed a motion to strike the ballots of the non-complying law firms, and there's been some confusion as to whether or not the 2019 order was issued in response to that motion or not. The objection she already entered in August, kind of out of the blue, surprised everyone with her 2019 order, but she did that because she'd been hearing about the 2019 issue. In Pittsburgh Corning's case and other asbestos cases, she issued that order, and then separately issued an order denying the London Market's motion to strike the ballots. That order was a November 2nd order where she denied their motion. That came after the final 2019 order, and there was no appeal from the November 2nd, 2004 order. That's correct, Your Honor. Those orders have not been appealed from, and they stand as rulings in a lot of the cases at this point in time. Secondly, I think Mr. Esterman had referred to the fact of the current status of the case. I'm going to bring the court up to date on that. In December of last year, the judge issued an opinion denying confirmation of the plan, the plan that we've been arguing about here. She denied confirmation on that. Again, based on the combustion engineering decision, multiple parties filed motions to reconsider, and the judge has taken those under advisement. We had briefing and argument on that. She's taken those under advisement. She has not issued a further ruling on the motions to reconsider. So we're waiting at this point. So at this point in time, there has not been a confirmation of the plan. It's not at all clear that this plan will ever be confirmed as it is. So many of the issues that you should have argued about is how this plan injures them are totally speculative, and quite likely will never, thus far, will never come to pass because this plan is probably going to have to be amended. Additionally, as far as the harms to the insurers, Judge Fitzgerald has stated repeatedly, I think as Mr. Esselstyn again pointed out publicly on the record, that she will make sure that the plan is insurance neutral. We have added a lot of provisions to the plan that make it insurance neutral. If you go through the plan and a number of the provisions, we've added language that that particular provision would not apply to the insurance companies, because those are the findings, the findings of fairness and so forth. We try to make clear that the findings that we're asking for are really going to find the 1129-type findings that the judge must make in order to confirm the plan, and that those won't be binding on insurers and subsequent coverage actions, again, to protect their response to their neutrality. Judge Fitzgerald has also assured them that any confirmation that she does end up entering is going to make, again, the insurance neutrality very clear. She hasn't had a chance to do that yet because we haven't gotten that far. But whenever she does issue the confirmation order, she's made it clear to everybody that she's going to make sure that it's insurance neutral. I have nothing else to add. All right. Thank you. Rebuttal? Yes, Your Honor. Briefly, just two or three points. Let me ask you a basic question. What if we were to find that you were correct, that strict compliance with 2019 was required so that every lawyer then had to go back and refile every single agreement with every client? What would that do for you? It would, Your Honor, provide basic compliance with the disclosure requirements. I know that. I know that. Compliance would be compliance. I know. And what would it do for us? What would it do for you? How would that help you in terms of your substantive rights? Your Honor, in some ways it's a difficult question to answer, but I will answer it this way. Well, you have to answer it because otherwise we don't know how you're being harmed by having it not done that way. Well, in Congolium, this court pointed out that a procedural due process right is enough, but I don't actually need to show harm. What I need to show is that a procedural due process right has been affected. So how am I harmed? I'm harmed, Your Honor, in the first instance by a deprivation of procedural due process, in the same way that the appealing insurers in Congolium were harmed. But that's a harm that anybody in the general public could make. It is a situation in this case, Your Honor, where only the insurers who are being asked to fund the plan and whose contractual rights are being modified have the wherewithal or the interest in ensuring that the claims are not paid in excessive amounts or the claims that shouldn't be paid are dealt with. We're the only people who have an economic interest in ensuring that aspect of the fairness of the plan. Your Honor, have you identified the loss of contractual rights in the plan? Your Honor, I cannot give you a pinpoint site, but I can tell you that it's in the reply brief, and I apologize for no pinpoint site on that. I can tell you, Your Honor, that there are a number of them listed, including specifically, and I know this because I took these out of the brief this morning to put into my notes. I just didn't grab the pinpoint site, Your Honor, and I apologize. With respect to the brief, it describes the removing of the insurers from the Assistance in Cooperation Clause benefits. In other words, we don't have the benefit of the Assistance in Cooperation Clause that we negotiated and is included in our contract. It's not a trivial right. The Assistance in Cooperation Clause says, in effect, that the insured, which in this case, that the insured owes an obligation to us to assist us and cooperate with us in dealing with the claims. That doesn't happen anymore if the plan is confirmed. That's a problem with confirmation then. I mean, isn't there another opportunity if Judge Fitzgerald says, I'm going to make sure this is insurance neutral, isn't there the opportunity for you to call her on that and require that that be done as part of the plan? Your Honor, the entire insurance neutrality argument in advance of confirmation is just simply not workable. And the reason for that, Your Honor, is it doesn't exist for a number of reasons. Number one, the debtors representative just told you that there is no plan confirmed, that the plan that was on the table was denied confirmation, that it is likely, I think under his words, that there will be modifications to that plan, and if they are material, as I'm sure they will be because confirmation was denied, there will be a subsequent round of balloting. We have no idea, Your Honor, what in any case, not just in this case, but in any Chapter 11 case that comes before you, you have no idea what the plan is going to actually say. To point to the combustion engineering case and say that the Third Circuit said that it was okay to substitute insurance neutrality for standing simply doesn't work, Your Honors, when you don't have a plan that has been confirmed in front of you to evaluate. And we don't. We don't know, despite Judge Fitzgerald's best efforts, we don't know what it is that this plan will say. And it is quite a stretch, Your Honors, in my opinion, to determine standing in an issue that is relatively straightforward on the prospect that in the future a judge is going to enter an order that is going to say something about there's no neutrality with respect to my client. And it's not just an order, Your Honor. I would like to just point to one quote that's not in the briefs, but that is the significance with which the United States Supreme Court views compliance with the rules. And this is in the Ankin case, which I'm sure you're familiar with. In Ankin, the court was looking not at Rule 2019 or a bankruptcy rule, but it was looking at a federal rule, Civil Procedure 23, and it pointed out, courts are not free to amend a rule outside of the process Congress ordered. A process properly tuned to the instruction that the rules of procedure shall not abridge any substantive right. The safeguards provided by the rule, we emphasize, are not impractical impediments, checks short of utility in the settlement class context. The enabling language that allows the United States Supreme Court to adopt the federal rules of civil procedures in all material respects is identical. And the approach of this court ought to be identical as well. To say that we should come back is to deny us all relief. As this court noted in Congolian, the fact of the matter is that a procedural challenge is not going to carry that much weight at the end of the day at confirmation. And secondly, what an enormous waste of judicial resources. What if we're right? The debtor has now told you that there will almost certainly be a new plan. That new plan will, in order to overcome the difficulties, have to have a balloting. Why is it more appropriate to make us wait through a whole other round of balloting, to make us wait until a final confirmation order to raise this order? Why not get it right now? Why not do it the way the Supreme Court says it should be done? And why hold it against us, when we are the parties who are being asked to pay under this plan, that we request and demand strict compliance with the rules? Thank you, Your Honors. Thank you, Counsel. We'll take the matter under advisement and clear the courtroom. Thank you, Your Honors. If you'll hold on.